Charles Oliff WREN, Plaintiff-Respondent,

v.

ST. LOUIS PUBLIC SERVICE COMPANY, a corporation, Defendant-Appellant.

No. 30383.

St. Louis Court of Appeals.

Missouri.

March 20, 1962.

V. James Ruddy, St. Louis, for appellant.

Gray & Jeans, Charles E. Gray, St. Louis, for respondent.

BRADY, Commissioner.

This appeal arises out of a suit for damages for personal injuries which resulted in a verdict for the respondent in the amount of $9,000. We will hereinafter refer to the parties by their designation at the trial. The defendant here contends: (1) that the trial court abused its discretion in overruling defendant's objection and motions for mistrial based upon plaintiff counsel's interjection of insurance into the case; (2) that the trial court prejudicially erred in refusing defendant's offered Instruction "D"; (3) that the trial court prejudicially erred in allowing plaintiff to read into evidence, over the defendant's objection, plaintiff's interrogatories No. 2 and No. 2A and the answers thereto; (4) that the trial court abused its discretion when it allowed plaintiff's attorney to pass plaintiff's Exhibit 7 to the jury as supposed rebuttal evidence; (5) that in giving Instruction IX the trial court prejudicially erred; and (6) that the verdict and judgment was so grossly excessive as to shock the conscience of the court, to be conclusive proof of passion and prejudice on the part of the jury, and to require a new trial or a substantial remittitur.

This appeal results from the second trial of this case. See Wren v. St. Louis Public Service Co., Mo., 333 S.W.2d 92. The factual situation disclosed by the evidence with reference to the accident itself shows that the plaintiff was driving his employer's truck in a line of traffic proceeding northwardly on Euclid in the City of St. Louis, and would alternately stop and proceed as traffic required; that there are two lanes for traffic in each direction on that street; that he brought the truck to a normal stop in the lane next to the center line of the street and was at the end of a line of vehicles so stopped; that the plaintiff was stopped in this position for a few minutes when struck from the rear by one of the defendant's buses; that the truck was equipped with a hydraulic lift on the tailgate which was in a down position at the time of impact placing the lift level with the truck bed; and that after the impact plaintiff alighted and saw a slit across the front of the bus where it had contacted this tailgate. It further appeared that the collision caused the plaintiff to be "thrown around in the cab" of the truck, and he experienced pain in his right shoulder, neck and back. The testimony dealing with his injuries will be later detailed herein.

The defendant's defense was sudden brake failure. The bus was following the truck in the same lane about 60 feet back when the truck made a normal stop. At a distance of about 45 feet from the truck the driver of defendant's bus began to apply the brakes. The bus was then proceeding at 15 m. p. h. It was then the driver discovered the brakes of the bus to be slack, and at a distance of 18 to 20 feet from the rear of the truck the driver pulled on the hand brake. The bus was going 8 to 9 m. p. h. when the hand brake was applied, and the combination of brakes

slowed the bus to 3 to 5 m. p. h. at impact. Prior to this time there was no sign of brake defect and with normal brakes the bus could have been stopped, at the speed it was traveling, within 40 to 45 feet, on direct examination, and 45 to 50 feet, on cross-examination. The steel edge of the tailgate came through the front of the bus and pinned the driver's foot to the foot-brake.

The defendant's first contention of prejudicial error as stated earlier herein is based on the continual interjection, as defendant states in its brief, " * * * into the case the irrelevant fact that the defendant was protected by insurance by so telling the jury during cross-examination of defendant's witness Norman Atkins, and by repeating the name of the insuror, the Transit Casualty Company * * * " nine times in his closing argument. Defendant asks, "What possible *legitimate* purpose could it have served to constantly advise the jury that the Transit Casualty Company, by whom Mr. Atkins was employed, was 'an insurance carrier'." The answer arises from the evidence Mr. Atkins was to give, and gave. An important issue in this case was the extent of the plaintiff's injuries and just how disabled plaintiff was. On this issue, the defendant introduced movies of the plaintiff taken on five different occasions. Defendant's counsel had stated, in his opening statement, "Now, my last witness, ladies and gentlemen, will be Mr. Norman Atkins. Mr. Atkins is a special investigator from *our office*, and I anticipate Mr. Atkins will testify that on approximately five occasions he has taken movies of Mr. Wren. * * * " (Emphasis supplied.) These films were taken a distance of about 100 yards or more from the plaintiff, and in some of them other people were shown. When Atkins was called, he was asked by defendant's counsel, "By whom are you employed?" and his answer was, "Transit Casualty Company." The plaintiff's cross-examination of Atkins went extensively into how the plaintiff could be identified in these films and sought to cast doubt on Atkins' testimony that the person shown was the plaintiff. While testifying, Atkins was asked, "By the way, who is, what is Transit Casualty?" and thereupon defendant's counsel objected that it " * * * would be overemphasis of the insurance, and would prejudice the defendant in the eyes of this jury by over-emphasizing the fact that there is insurance in this case." The plaintiff's theory was that while Atkins was shown to have been working for Transit Casualty Company, there was no connection of that company with this case, and that to show the interest Atkins had in the outcome of the trial, the interest of his employer, Transit, had to be shown. The trial court overruled the objection, stating that in doing so it relied upon Clayton v. St. Louis Public Service Company, Mo.App., 276 S.W.2d 621. The plaintiff's counsel then restated his question: "Sir, the question is what interest does Transit Casualty Company have in this lawsuit", and Atkins answered, "The insurance carrier, I assume."

■ The authenticity and accuracy of the movies taken by Atkins were material to the issue of the extent and nature of the plaintiff's injuries and the damages to be awarded. They had a definite bearing upon the weight to be given by the jury to the plaintiff's medical testimony and constituted an attack upon and refutation of the testimony of plaintiff's fellow workers. The defendant urged the films upon the jury without any qualifications. Under these circumstances the plaintiff was entitled to show that Atkins, who took the films, was an employee of Transit Casualty, who was financially interested in the outcome of this litigation. Those who are interested can find a learned and complete examination of the authorities in Leavitt v. St. Louis Public Service Company, Mo.App., 340 S.W.2d 131 at loc. cit. [9], page 138 and [10], pp. 138–139. See also Clayton v. St. Louis Public Service Company, Mo.App., 276 S. W.2d 621 at loc. cit. [1, 2], page 624.

The plaintiff also contends that the reference to Transit Casualty Company by plaintiff's counsel in argument constituted reversible error. In ruling this point, we call attention to Instruction No. VII, given by the court at the request of defendant. This so-called credibility of the witness instruction states in its part pertinent to this inquiry:

> "The Court instructs the jury that you are the sole judge of the credibility of the witnesses and of the weight to be given to their testimony. In determining such credibility and weight, you may take into consideration the witness, his or her manner on the stand, his or her interest, if any, in the result of the trial, his or her relation to or feeling towards the parties to the suit, the probability or improbability of his or her statements, as well as all the other facts and circumstances given in evidence. * * *"

The defendant commented on this instruction at some length in its closing argument. Counsel read the instruction to the jury and stated, "Now, that is an important instruction, Ladies and Gentlemen, and please read it when you go upstairs, and study it." Counsel then proceeded to comment in detail upon the testimony given by certain of plaintiff's medical witnesses, and also upon the fact that one doctor who examined plaintiff was not called; and then stated:

> "Now, that is his testimony, Ladies and Gentlemen. That is the testimony of almost all the witnesses. And on that testimony they are asking you to bring in a verdict for the plaintiff. Again, that big word 'credibility.'"

Moreover, defendant went on to argue that the plaintiff's fellow employees might be reluctant to testify against the plaintiff's interests.

It is clear that defendant relied upon Instruction No. VII, and it was certainly within his rights to do so. But Instruction No. VII does not mean that the jury is entitled to take into consideration the interests of only the plaintiff's witnesses. It also had equal force when the jury was considering the credibility of the defendant's witnesses and so was available for argumentative purposes to plaintiff's counsel. Moreover, the trial court is allowed large discretion in permitting or restraining argument of counsel, and the rulings of the trial court are generally deferred to on appeal, Satterfield v. Southern Railway Company, Mo.App., 287 S.W.2d 395. The wisdom of the rule is obvious, for inflections of voice do not appear from the printed pages of the transcript, nor do many other circumstances that surround the making of such a statement as here involved, but all of these matters are directly within the knowledge of the trial court who heard the statements made in context. Under the facts of this record, we cannot hold that the trial court abused its discretion. It follows that this assignment of error must be ruled adversely to defendant.

There are several reasons why defendant's second allegation of prejudicial error is without merit. Defendant urges that its offered Instruction "D" was a true converse of an essential element of plaintiff's verdict directing instruction. Of course, if it was, the defendant is entitled to have had Instruction "D" given. Frazier v. Ford Motor Company, 365 Mo. 62, 276 S.W.2d 95; Dell'Aria v. Bonfa, Mo., 307 S.W.2d 479 at l.c. [1, 2] p. 480. It is not necessary to set out either instruction in full herein to illustrate that Instruction "D" is not a converse of the essential element submitted by plaintiff's verdict directing instruction. The verdict directing instruction read, in its part pertinent to this inquiry, "* * * that a bus of the St. Louis Public Service Company, being operated by one of its employees, traveling northwardly on Euclid Avenue, overtook the plaintiff's truck, if you so find, and that the bus operator negligently and carelessly allowed it to run into and collide with the rear end of plaintiff's truck, if you so find * * *." Defendant's offered Instruction "D" in this respect read, "* * * if you find and be-

lieve from all the credible evidence that the defendant did not negligently run into and collide with the rear end of the truck mentioned in the evidence * * *." It is obvious that Instruction No. I limited the negligence to defendant's bus operator, while defendant's offered Instruction "D" was much broader and, keeping in mind that the defendant's alleged defense was a sudden brake failure, would have allowed the jury to find that the defendant was not negligent in the maintenance of its brakes. Under this factual situation, defendant's offered Instruction "D" was not a converse of Instruction No. I.

█ Another answer is that the defendant was allowed to submit its defense of sudden brake failure, and did so in full in its Instruction No. II. That instruction, although more detailed than the offered Instruction "D", submitted the same defense and since that defense was once submitted, defendant cannot now complain that it was not submitted in another manner.

In preparation for the trial, the plaintiff served interrogatories on the defendant and when the plaintiff, at the close of its evidence in chief, attempted to read at the trial two of the questions therein propounded and the answers given, defendant objected on the grounds of privilege. The plaintiff's position as stated to the court was that the defendant had waived the privilege by answering the interrogatories, and that, as plaintiff's counsel stated to the court, " * * * The photographs themselves may be privileged, but if the evidence shows that the pictures were taken and the defendant failed to produce these pictures, they have evidence which they are withholding, and I am entitled to make a comment on that." At another point during the discussion held out of hearing of the jury, the plaintiff's counsel stated, " * * * If they have some relevant document which they withhold out of the courtroom, we are entitled to comment on their failure to produce it." The interrogatories and answers were as follows:

"Q. State whether or not photographs were made of the bus referred to in the Interrogatory No. 1 following this accident."

"A. Yes, one photograph of bus made."

"Q. (a) If the answer to Interrogatory 2 is yes, state when and by whom the photographs were made."

"A. G. E. Palfrey, Sr., 741 Eastgate, March 8, 1956."

The defendant rejoined that " * * * the reading of this interrogatory and the reading of the answer, this will force the defendant in the eyes of this jury to have to introduce this picture into evidence, which picture shows substantial damage to the bus, and which would be prejudicial to the defendant in the trial of this lawsuit. We will be forced to introduce this picture." The trial court overruled the objection on the ground that the defendant did not object at the time the interrogatories were filed, or file a motion to strike the answers after this attorney came into the case for this second trial. The questions and answers above set out were then read to the jury by plaintiff's counsel. During the defendant's evidence, the defendant introduced the photograph referred to in the interrogatory, defendant's Exhibit H, and had it identified by the defendant's driver. The defendant requested that this photograph, along with its other exhibits, be passed to the jury, and this was done. The photograph was certainly material as it showed extensive damage to the front of the bus. The whole front end was shown as caved inward and this was important evidence on the severity of the impact.

█ In State ex rel. Uregas Service Co., Inc. v. Adams, 364 Mo. 389, 262 S.W.2d 9 at loc. cit. [4] page 12, the rule of State ex rel. Terminal R. Ass'n of St. Louis v. Flynn, Mo., 257 S.W.2d 69, was extended to interrogatories seeking information as to whether any pictures were taken, how many, and by whom. Accordingly, the interroga-

tories need not have been answered, but they were answered. We have heretofore held that photographs are not privileged per se, State ex rel. St. Louis County Transit Company v. Walsh, Mo.App., 327 S.W.2d 713, and the question is whether the defendant waived its privilege.

■ Section 510.020 RSMo 1959, subsection 3, V.A.M.S., provides a method whereby the defendant could have avoided answering interrogatories 2 and 2A. This action was first tried prior to the effective date of the new Rules of Civil Procedure, but see Civil Rule 56.01, V.A.M.R., which supplements § 510.020, supra. In any event, the provisions of that section of our statutes were in force at the time the interrogatories were served prior to the first trial. That section was enacted in 1943, (see Laws of Missouri, 1943, p. 353, § 85) and this accident took place in March, 1956. Accordingly, the provisions of § 510.020, subsection 3, supra, were available to the defendant so that it could have thereby objected to these two interrogatories on the grounds of privilege as held in State ex rel. Uregas Service Co. v. Adams, supra, a 1953 decision. Defendant did not do so, and thereby waived its privilege. Insofar as the defendant's contention that this would force it to introduce such evidence is concerned, the simple answer is that had defendant availed itself of the provisions of § 510.020, subsection 3, supra, it would not have found itself in such a position, and cannot now be heard to complain because it did not do all that it could have done. Another answer is that the reading of these interrogatories did not force the defendant to introduce the photograph. Defendant thereafter had a choice. It could introduce the photograph, or it could refuse to do so and thereby make its failure a matter for comment by opposing counsel, State ex rel. St. Louis County Transit Company v. Walsh, supra. Admittedly its choice was difficult as viewed from the defendant's own interest, but that difficulty finds its origins in defendant's own conduct with respect to its earlier inaction as to these interrogatories. It fol-lows that the trial court correctly ruled the objection, and defendant's contention of prejudicial error is without merit.

■ The defendant's fourth allegation of prejudicial error arises from the trial court's action in allowing the plaintiff's attorney to pass plaintiff's Exhibit 7 to the jury at the close of defendant's evidence. This exhibit was an X-ray taken by the plaintiff's doctor, which was introduced into evidence during the plaintiff's case. The plaintiff's medical witness, Schaerer, testified that plaintiff's first rib was abnormal and that the space between the collarbone and the ribcage was narrowed by this abnormality with the result that there was not as much room for the nerves to pass by on that side of the body as there was on the other side. It was his opinion that the accident caused a nerve to be pushed or pinched against the bony prominence, as he described the abnormality, with the resulting irritation to and discomfort of the plaintiff. During the defendant's case, it called its medical witness Weir, a radiologist, who used the same X-ray Schaerer had used and testified that he saw no evidence of abnormality. On cross-examination Weir was requested by plaintiff's attorney to outline on the X-ray with a black pencil the first set of ribs. The witness did so. After defendant closed its case, plaintiff's counsel requested permission to pass this marked X-ray to the jury, and the defendant's counsel stated, "Defendant will object to the passing of this Plaintiff's Exhibit No. 7, which is an X-ray taken by plaintiff's doctor, on the ground that it is not proper rebuttal. It is not rebuttal to anything that the defendant has offered, and it would certainly be prejudicial for this last item to be passed to this jury, being an X-ray taken by the plaintiff's doctor, and marked by the defendant's doctor. I can't see where it is rebuttal to any witness." The trial court overruled the objection on the ground that this was the first opportunity the plaintiff had to show the marked X-ray to the jury after it had been marked by defendant's medical witness, Weir, and after

that witness had contradicted the plaintiff's medical witness, Schaerer, to the effect that the plaintiff had an abnormal rib. Whether or not this exhibit should have been passed to the jury under the circumstances above related was within the proper exercise of judicial discretion of the trial judge. Where, as here, the exhibit would allow the jury to form its own conclusion as to which of the doctors it would believe as to the testimony concerning whether or not plaintiff had an abnormal rib, we cannot say that discretion has been abused so as to require our interference.

The defendant, in its statement of this point in its brief, also contends: "The X-ray itself was not evidence for it is the expert's interpretation of the X-ray that is the evidence." The objection made by the defendant at the trial did not contain any such contention. We can consider only the objection made at trial. In re Stein's Estate, Mo.App., 177 S.W.2d 678 at l. c. [10], page 683; Johnson v. St. Louis Public Service Co., Mo.App., 256 S.W.2d 308, at l. c. [4], p. 313; Ragsdale v. Tom-Boy, Inc., Mo.App., 317 S.W.2d 679 at l. c. [14] p. 689, and express no opinion on the contention which the defendant now attempts to raise, ruling only that the trial court did not abuse its discretion in allowing plaintiff's attorney to pass this X-ray exhibit to the jury under the facts disclosed by this transcript and considering the objection of the defendant made at the trial.

The defendant attacks the giving of Instruction IX, and in its statement of this point in its brief alleges: " * * * that there was no substantial evidence to support subparagraph 4 thereof, which permitted the jury to consider plaintiff's loss of earnings when there was no substantial evidence that plaintiff had suffered any loss of earnings." Subparagraph 4 of Instruction IX reads as follows:

" 'FOURTH: Such loss of earnings, if any, which plaintiff has suffered as a direct result of such injuries.' "

The transcript discloses that the defendant made a general objection to the giving of Instruction IX at the trial, and therefore made his specific objections to the giving of that instruction in his motion for new trial as required by Civil Rule 70.02, V.A.M.R. The specific objections to Instruction IX which were contained in Paragraph 22b of the motion for new trial do not contain the specific assignment of error which the defendant now attempts to raise. Accordingly, it is not preserved for our review. Civil Rule 70.02, supra.

The defendant's last allegation of prejudicial error is that the verdict and judgment was so grossly excessive as to shock the conscience of the court, to be conclusive proof of passion and prejudice on the part of the jury, and to require a new trial or a substantial remittitur. This contention requires a review of the evidence concerning plaintiff's injuries. In doing so, we are to view that evidence in the light most favorable to plaintiff, Appelhans v. Goldman, Mo., 349 S.W.2d 204. Taken in such light, the evidence shows that the plaintiff was 43 years of age at the time of the second trial in October, 1960, and that the accident in question occurred in March, 1956. Immediately following the accident, plaintiff testified that he started having pains in his right shoulder, neck area, and down the back; that after he completed the delivery he was on when the accident occurred, he went back to his shop, reported to his supervisor, went home, and then went directly to Dr. Ott; at that time he was having severe pain in his neck area and right shoulder; that the next morning his entire arm was completely paralyzed and he went back to the doctor and had X-rays taken; that he was off work ten days following the accident and had severe pain in his right arm with the arm completely paralyzed for a portion of that time; that upon returning to work he discovered that if he did any heavy lifting, it resulted in severe pain which required the use of a heat pad and a traction device or a return visit to the doctor to alleviate; that this traction de-

vice consisted of a halter and pulley fastened on his bed which he uses when the pain in his neck gets severe, but that sometimes this will not relieve the pain and it is necessary to go back to the doctor for relief. The testimony from the plaintiff's fellow employees was that prior to the accident plaintiff would assist them in their work, but that since the accident he has not done so and on occasions has complained of pain. Dr. Schaerer, a neurosurgeon, testified that when he first examined the plaintiff, plaintiff complained of pain in his neck on the right side and in the right shoulder; that his examination disclosed an area extending from the middle and ring fingers of the right hand, up the right arm in a striplike fashion to the neck including the lower part of the neck in which the plaintiff had some loss of sensation; that there was also weakness of the grip of the right hand; that his impression at that time was that the plaintiff had a cervical disc injury and he recommended hospitalization and myelography; that the plaintiff went to the hospital and the myelogram showed no abnormality; that this witness saw the plaintiff again in February, 1958, when he was complaining of headaches and treated him by injection of a local anesthetic in the back of the neck. It was Dr. Schaerer's opinion that the plaintiff had sustained a cervical nerve root irritation which is persistent and chronic, and since it had been so for a period of two years it was the witness's further opinion that the irritation was the result of scar tissue formation following injury to the nerve root. This witness again examined the plaintiff in October, 1960, and it was his opinion that the plaintiff's condition allowed him to work, but with a continuous degree of pain, and that on the basis of his examinations and treatment the witness concluded that the plaintiff's condition would continue to be painful and was permanent.

Dr. Ott's testimony was that he examined the plaintiff on March 7, 1956, and in addition to the plaintiff's complaints as to severe pain in the right neck and shoulder which traveled down the right arm and a feeling of numbness and weakness in the right arm, the witness found a marked swelling on the right side of the neck with a very marked muscle spasm and some muscle painfulness in the lower lumbar area; that this spasm in the lower lumbar area cleared up in about two weeks; that the plaintiff continued under his care and was seen on six other occasions in March, on two occasions in April, two in May, one in June, and one in November of 1956; that he recommended that plaintiff obtain a head halter so that he could undergo traction at home and that during this time he also gave plaintiff injections to alleviate pain. The witness further testified that he last examined the plaintiff on October 22, 1960, that at that time the findings he had previously made were repeated except that the muscle spasm seemed to be more acute; that on that occasion the plaintiff was treated by manipulation to relieve the spasm and given a sedative, relaxant-type of drug; that there would be a fluctuation in the amount of pain plaintiff would experience which would vary with many factors, such as the amount of work done; that in his opinion the plaintiff's condition was now chronic; that it was the witness's opinion that the plaintiff had sustained soft tissue injury in the neck that gradually produces a chronic thickening or swelling of the fibers of the tissues of the neck or of the supporting tissues in the area; and that this is a permanent condition which is extremely painful on occasion but not constantly.

The hospital records of St. Joseph's Hospital were introduced and these records also contain a finding of numbness or loss of sensation affecting the third and fourth fingers extending up the dorsal aspect of the forearm and the lateral aspect of that arm about one to two inches from the widest area affected. The weakness in the right hand was also found.

The defendant cites two cases in which he contends the injuries were analogous and which resulted in verdicts for $3,500 and $4,500. The verdict in each of the cases was affirmed. It is too well recognized to re-

quire citation that in determining the excessiveness of a judgment, each case is to stand upon its own facts. We have concluded upon a careful review of the evidence that the verdict and judgment is not so excessive as to so shock the conscience of this court as to require a remittitur or a new trial.

The judgment should be affirmed. The Commissioner so recommends.

PER CURIAM.

The foregoing opinion of BRADY, C., is adopted as the opinion of this court. The judgment is affirmed.

ANDERSON, P. J., WOLFE, J., and SAM C. BLAIR, Special Judge, concur.

RUDDY, J., not participating.